# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1217
_____

Curtis Temple

*Plaintiff - Appellant*

v.

Bryan Mercier, Assistant Secretary of Indian Affairs, Department of Interior, Bureau of Indian Affairs; Olivia M. Steve, Great Plains Regional Director, Department of Interior, Bureau of Indian Affairs; Lionel Weston, Branch of Realty, Pine Ridge Agency, Bureau of Indian Affairs, Department of Interior; Gina Douville,[1] Superintendent of the Pine Ridge Agency, Department of Interior, Bureau of Indian Affairs

*Defendants - Appellees*

Oglala Sioux Tribe; Denise Mesteth; Jolene Provost

*Movants - Appellees*
_____

Appeal from United States District Court
for the District of South Dakota - Western
_____

Submitted: October 23, 2024
Filed: January 28, 2025
_____

---

[1]Assistant Secretary Mercier of Indian Affairs, Great Plains Regional Director Steve, and Superintendent Douville of the Pine Ridge Agency are automatically substituted for their predecessors under Federal Rule of Appellate Procedure 43(c)(2).

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Curtis Temple appeals from a final judgment entered following a bench trial in which the district court[2] found that Temple was afforded due process prior to the impoundment of several head of his cattle found to be improperly grazing on the Pine Ridge Indian Reservation. He likewise appeals the denial of a motion to continue made two weeks before trial, the district court's[3] quashing of a subpoena directed towards tribal employees, and the dismissal of claims concerning the allocation of grazing permits. Having jurisdiction under 28 U.S.C. § 1291, we affirm the judgment of the district court.

I.

Temple is a cattle rancher and member of the Oglala Sioux Indian Tribe (OST) who lives on the Pine Ridge Indian Reservation. The OST grants livestock grazing permits through the "tribal allocation" process, which allows the tribe to grant grazing privileges on tribal owned lands to tribal members "without competition," i.e., without requiring members to competitively bid on the permits. See 25 C.F.R. §§ 166.217(a), 166.4. All allocations, while determined by the tribe, are subject to the approval of the Board of Indian Appeals (BIA) and grant the permit holder the right to graze his or her cattle on land "owned by a tribe or individual Indian in trust." 25 C.F.R. §§ 166.203(a), 166.4. Essentially, an allocation leases grazing land to the designated permittee for a specific period of time. To be eligible for an allocation of grazing land under the OST grazing code, a party must send an application to the

_____

[2]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

[3]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota, now retired.

tribe's allocation committee, be a member of the OST, and own no more than "three hundred animal units." O.S.T. Ord. No. 11-05, at 6-7, § 3.

On October 31, 2012, Temple's permits to graze his cattle on the reservation expired, and he timely re-applied for new grazing permits through the allocation process, see 25 C.F.R. § 166.200 et seq., but so did another member of the OST: Donald "Duke" Buffington. The allocation committee conducted a livestock count on both Temple's and Buffington's cattle to determine whether either party was eligible for a grazing permit. Upon inspection, Temple had over 1,600 cattle on the reservation, while Buffington had 92 cattle. This put Temple well over the maximum threshold of 300 animal units set by the tribe's grazing code, making Buffington the only eligible applicant.

The OST awarded Temple's former grazing permits to Buffington, and the BIA notified Temple of this decision in writing. The letter explained that Temple had the right to appeal the decision of the OST allocation committee to the executive committee, which he did. After a hearing, the executive committee affirmed the decision to allocate the permits to Buffington since Temple's herd size made him ineligible. Temple filed an administrative appeal to the BIA's regional director, which was also unsuccessful. Temple appealed the BIA's decision to the Interior Board of Indian Appeals (IBIA) but voluntarily dismissed the action before the IBIA conducted its review. Temple had also filed a separate lawsuit against the OST allocation committee in the tribal court in 2013. In August 2019, the tribal court dismissed the action, holding that the court lacked subject matter jurisdiction over the suit because the United States was an absent but necessary party that enjoyed federal sovereign immunity. In the tribal court's view, Temple's claims were "properly addressed to the BIA through the federal administrative process." Temple did not appeal this decision to the tribe's supreme court.

While Temple was appealing the permit decisions, he continued to allow his cattle to graze on the land which had then been allocated to Buffington. The BIA conducted routine compliance checks on all allocated grazing lands and repeatedly

found Temple's cattle grazing on Buffington's land. Over the course of two years, the BIA conducted at least 20 compliance checks and found hundreds of Temple's cattle impermissibly grazing during this period. After each compliance check, the BIA superintendent issued a written warning to Temple pursuant to 25 C.F.R. § 166.800 et seq., giving him three days to remove the livestock or "show why the[] livestock [were] not trespassing [on the] trust property." Of the 20 notices of trespass he received, Temple responded to just one, acknowledging receipt of the other notices while asking for "patience" while he continued "pursu[ing] to isolate his cattle" onto lands which, as he alleged, were his alone. The BIA responded to this letter, rejecting Temple's claim that he was the sole owner of any relevant grazing land and reminding him that he "[did] not have any right to graze his livestock" on the lands now allocated to Buffington. Temple failed to remove his cattle, and the BIA impounded his cattle on two separate occasions.

Temple filed his original complaint in the District of South Dakota in August 2015, seeking a temporary restraining order (TRO) to block the sale of the impounded cattle and contesting the allocation of grazing permits to Buffington. The district court denied the TRO and also dismissed without prejudice Temple's claims concerning the permit allocation decision, finding that Temple was required to exhaust his administrative remedies on these claims before they could be heard in federal court. As part of these claims, Temple subpoenaed two tribal officials, seeking information and documents pertaining to the denial of his permit applications. Upon motion by the OST, the district court quashed the subpoenas based on tribal sovereign immunity. Temple's surviving due process claims asserted that he did not receive a meaningful opportunity to be heard prior to the impoundments of his cattle. Unlike his permit allocation claims, the district court ruled that exhaustion was not required for his due process claims, but Temple still filed appeals to the IBIA regarding (1) the determinations that his cattle were grazing in trespass and (2) the decisions to impound the allegedly trespassing cattle. Thus, the district court entered a stay on all proceedings in 2019 pending the IBIA's adjudication of Temple's appeals.

Because the IBIA had not yet ruled on Temple's administrative appeal, the district court lifted the stay on the proceedings in May 2023 with trial on Temple's due process claims set for August 2023. Two weeks after setting the case for trial, one of Temple's attorneys, Terry Pechota, filed a motion for leave to withdraw. The district court granted the motion, as Temple still retained another attorney, James Hurley, who had participated in this action for over five years. Hurley moved for a continuance that August, claiming an inability to be ready for trial later that month given the addition of a new attorney to the trial team. The district court denied the motion, and the bench trial proceeded as scheduled. The district court ultimately held that the written notices of trespass provided to Temple prior to the impoundment of his cows did not violate his procedural due process rights; Temple "failed to take advantage of the many opportunities provided in the notices to cure the trespass or give sufficient written notice of a legal right to graze the range units in question;" and this failure doomed his due process challenges. Temple now appeals, challenging the judgment on his due process claim, dismissal of his permit allocation claims, and denial of his motion to continue.

II.

Temple first argues that the district court erred because he was denied a meaningful opportunity to be heard, in violation of his Fifth Amendment due process rights, prior to the impoundment of his cows. "We review the district court's due process analysis . . . de novo." Doe ex rel. Doe v. Todd Cnty. Sch. Dist., 625 F.3d 459, 463 (8th Cir. 2010). "Procedural due process imposes constraints on governmental decisions which deprive individuals of . . . 'property' interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). Due process mandates "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." Boddie v. Connecticut, 401 U.S. 371, 379 (1971). "The essential requirements . . . are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). Relevant here, an opportunity to respond is "[t]he opportunity to present reasons, either in person or in writing, why proposed

action should not be taken." Id. "[R]esolution of the issue whether the administrative procedures provided…are constitutionally sufficient requires analysis of the governmental and private interests that are affected." Mathews, 424 U.S. at 334. Thus, the extent of procedural safeguards required depends on the nature of the interest at stake. See Goldberg v. Kelly, 397 U.S. 254, 262 (1970).

Neither party disputes that Temple had a property interest in his cattle sufficient to trigger due process. Temple also concedes that the 20 notices of trespass were sufficient to satisfy the notice requirement. Appellant Br. 16. The remaining issue is whether the procedures delineated in 25 C.F.R. § 166.800 et seq. provided Temple with a meaningful opportunity to respond and contest the trespass determinations prior to the deprivation of his cattle. According to the statutory scheme, the BIA delivers a comprehensive written notice to the offender when it locates a party's cattle grazing outside of its authorized area, which includes:

> (1) the basis for the trespass determination; (2) a legal description of where the trespass occurred; (3) a verification of ownership of unauthorized property (e.g., brands in the State Brand Book for cases of livestock trespass, if applicable); (4) corrective actions that must be taken; (5) time frames for taking the corrective actions; (6) potential consequences and penalties for failure to take corrective action; and (7) a statement that unauthorized livestock or other property may not be removed or disposed of unless authorized by [the BIA].

25 C.F.R. § 166.803(a). Should an aggrieved party wish to challenge the trespass determination, he may "[c]ontact [the agency] in writing to explain why the trespass notice is in error." 25 C.F.R. § 166.804(b). The agency then reviews the issuance of the notice, and if it "determines that [it] issued the trespass notice in error, [it] will withdraw the notice." Id. Not only do these regulations provide an opportunity to contest the trespass determination prior to impoundment, but they also provide an opportunity for the affected party to cure the violation. See § 166.808(a) (stating that an intent to impound letter will only be issued "[i]f trespass is not corrected in the time specified in the initial trespass notice").

-6-

Here, Temple does not contest the district court's finding that he "failed to take advantage of the many opportunities provided in the notices to cure the trespass or give sufficient written notice" challenging the trespass determination. In Temple's view, he should have received an opportunity to be "meaningfully heard," but he supplies no alternative procedural safeguard that would grant him such an opportunity. Temple also turns a blind eye to the fact that he received over *twenty* notices of trespass, all of which he could have responded to in writing pursuant to § 166.804(b).[4] For example, each letter stated that he had the right to "show cause why these livestock are not trespassing." This method gave Temple a "meaningful opportunity to present [his] case." See Mathews, 424 U.S. at 349. As stated by the district court,

> [t]he BIA was not required to allow plaintiff to continue to graze in trespass, depriving the owner of the grazing permit of lawful use of the grazing permits, overgrazing and causing damage to the range units, all while paying no rent for the unlawful use of the grazing units. Plaintiff was acting as nothing but a holdover tenant and the BIA was legally authorized to institute trespass proceedings to protect the trust lands.

The BIA was also careful to count the trespassing cattle, impounding only those which infringed upon Buffington's parcels, and Temple does not challenge this factual finding on appeal. In sum, the interest in preserving grazing land in combination with the BIA's care in determining which cattle were trespassing vastly outweighs Temple's desire for a more "meaningful" opportunity than responding in writing. Temple's failure to take advantage of his opportunity to contest the findings of trespass dooms his procedural due process claim, and we discern no error by the district court.

---

[4]Temple also appears to admit that his cattle were *actually* trespassing in his sole response to the BIA. See R. Doc. 15-2, at 2 ("While Mr. Temple will continue to pursue to isolate his cattle onto his personally owned and/or leased lands, we are asking that you extend further patience with us as we further those pursuits.").

III.

Temple next argues that the district court erred by dismissing his permit allocation challenges for failure to exhaust his tribal remedies. "[T]he legal scope of the [tribal exhaustion] doctrine is a matter of law to be reviewed de novo." Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 849 (8th Cir. 2003). "The tribal exhaustion doctrine is based on 'a policy of supporting tribal self-government and self-determination,' and it is prudential, rather than jurisdictional." Id. (quoting Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 856 (1985)). Therefore, "as a matter of comity, the examination of tribal sovereignty and jurisdiction should be conducted in the first instance by the tribal court itself." Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Rsrv., 27 F.3d 1294, 1299 (8th Cir. 1994). Under this doctrine, a federal court "should stay its hand until tribal remedies are exhausted," United States ex rel. Kishell v. Turtle Mountain Hous. Auth., 816 F.2d 1273, 1276 (8th Cir. 1987), meaning that the "tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts" prior to federal adjudication. Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 17 (1987).

In his prayer for relief, Temple requested that the district court "declare that [Temple] ha[d] been unlawfully deprived of his rights under the applicable OST laws pertaining to the granting and termination of range units and leases." These claims inherently "raise[d] questions of tribal law and jurisdiction" and asked the district court to interpret the tribe's grazing code and evaluate the substantive decision to award permits to Buffington. See Duncan Energy, 27 F.3d at 1300. Because Temple's permit allocation challenges concerned "tribal-related activities on reservation land" and jurisdiction over those activities "presumptively lies in the tribal courts," Temple was required to allow the tribal court to hear his claims before bringing suit in federal court. See id. at 1299. To permit otherwise would circumvent "the [f]ederal [g]overnment's longstanding policy of encouraging tribal self-government" and ignore the "deference that federal courts afford tribal courts" which is "deeply rooted in Supreme Court precedent." Id. (citing LaPlante, 480

U.S. at 14). Although Temple eventually brought his claims before the tribal trial court,[5] he did not fully satisfy his burden under the tribal exhaustion doctrine because he did not allow the tribal "appellate court[] . . . the opportunity to review the determination[] of the lower tribal court[]." LaPlante, 480 U.S. at 17. By failing to appeal the determination of the tribal court, he failed to exhaust his tribal remedies, and the district court correctly dismissed his permit claims under the tribal exhaustion doctrine.[6]

## IV.

Finally, Temple argues that the district court erred in denying his motion to continue, made just two weeks before trial. "Motions for continuances are addressed to the sound discretion of the court and rulings upon such motions are reversible only upon showing abuse of discretion." Lessmann v. Comm'r, 327 F.2d 990, 996 (8th Cir. 1964). "[I]n a civil case[,] an attorney's withdrawal does not give [the] client an absolute right to a continuance." Grunewald v. Mo. Pac. R. Co., 331 F.2d 983, 986 (8th Cir. 1964). When litigation has been pending for years and the parties

---

[5]We note that the tribal court found that Temple should have brought his claims before the IBIA. As Temple voluntarily dismissed his appeal with the IBIA, even if the tribal exhaustion doctrine did not compel dismissal, his failure to exhaust his administrative remedies would. See Curtis Temple v. Great Plains Reg'l Dir., BIA, 60 IBIA 296, 2015 WL 2432185 (May 11, 2015); 25 C.F.R. § 166.3 ("[A]ppeals from decisions by the BIA under this part may be taken pursuant to 25 C.F.R. part 2"); 25 C.F.R. § 2.100 ("[Y]ou must exhaust the appeal mechanisms available under this part before you can seek review in a [f]ederal district court under the Administrative Procedure Act.").

[6]In Temple's own words, the question of whether the district court erred in quashing two subpoenas directed toward tribal employees is "[i]nterconnected to the issue regarding [the permit] claims." Appellant Br. 28. See Alltel Commc'ns, LLC v. DeJordy, 675 F.3d 1100, 1105 (8th Cir. 2012) (explaining "that a federal court's third-party subpoena in private civil litigation is a 'suit' that is subject to Indian tribal immunity"). Because the tribal exhaustion doctrine bars review of these claims, we cannot and do not reach the subpoena issue.

have had ample notice of trial, it is difficult to demonstrate an abuse of discretion by the district court in denying a motion for continuance. See Lessmann, 327 F.2d at 995-96. Further, even though the district court permitted attorney Pechota to withdraw two months before trial, Temple still retained "other competent counsel[, Hurley,] and would not be 'left in the lurch'" by this departure. In fact, attorney Hurley had been a part of this action for over five years. Temple argues that the fact he added new counsel two weeks prior to trial established grounds for a continuance, but the lawyer's addition does not change the equation: Temple was represented by Hurley, who had ample notice of trial and had been on his team for five years. The district court did not abuse its discretion in denying the motion to continue.

V.

For the foregoing reasons, we affirm the judgment of the district court.

_____